**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **WILLIAM J. TURNER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 14 CV 02237** |
| **v.** ) | |
| ) | **Honorable Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Michael T. Mason, United States Magistrate Judge:

Claimant William J. Turner ("Turner" or "Claimant") has brought a motion for

summary judgment (Dkt. 12) seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner"). The Commissioner denied

Claimant's claim for Disability Insurance Benefits ("DIB") under Sections 216(i) and

223(d) of the Social Security Act (the "Act"), 42 U.S.C. §§ 416 and 423. The

Commissioner has filed a cross-motion for summary judgment (Dkt. 21), asking the

court to uphold the decision of the Administrative Law Judge (the "ALJ"). The Court has

jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth

below, Claimant's motion for summary judgment is granted and the Commissioner's

cross-motion for summary judgment is denied.

**I.      BACKGROUND**

**A.      Procedural History**

In January 2011, Claimant filed his application for DIB alleging that he has been

disabled since June 1, 2008 due to heart problems, foot problems, sleep apnea, and left arm problems.  (R. 72-73.)  Claimant's application was denied initially on July 25, 2011 and upon reconsideration on November 14, 2011.  (R. 98-102, 105-08.)  Claimant then filed a timely request for a hearing.  (R. 110-11.)  On January 23, 2013, Claimant appeared with counsel at a hearing before ALJ Carla Suffi.  (R. 37-71.)  A vocational expert also testified at the hearing.  (*Id.*)  On February 5, 2013, the ALJ issued a written decision denying Claimant's disability claim.  (R. 19-29.)  On March 2, 2013, Claimant requested review by the Appeals Council.  (R. 14-15.)  The Appeals Council denied Claimant's request for review on February 4, 2014, at which time the ALJ's decision became the final decision of the Commissioner.  (R. 1-5); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  This action followed.

**B.    Medical Evidence from Treating Physicians**

Again, Claimant seeks DIB for disabling conditions stemming from coronary artery disease and angina, a 2008 myocardial infarction, stenting in April 2008 and December 2008, a left shoulder and heel fracture, sleep apnea, and postural hypotension.

**1.    Advocate South Suburban Hospital**

Claimant had a heart attack in April of 2008.  (R. 288.)  On April 23, 2008, Dr. Ghani treated Claimant at Advocate South Suburban Hospital ("South Suburban") and inserted a stent in a vessel that was ninety percent blocked.  (R. 343.)  The following day an echocardiogram exam revealed normal results.  (R. 329-30.)  On May 8, 2008, Claimant underwent a treadmill stress test.  (R. 328.)  Dr. Ghani reported mildly limited functional capacity, but stated that there was no clinical or electrocardiographic

evidence of exercise provoked myocardial ischemia or arrhythmias. (R. 328-29.) Claimant denied any chest pains or shortness of breath at an office visit on August 11, 2008. (R. 398.)

At a follow up visit on December 1, 2008, Claimant complained of chest pains. (R. 394.) Dr. Ghani added Norvasc to his medication regimen and strongly recommended he modify his lifestyle and stop smoking. (*Id.*) Two weeks later, Claimant had a second stent inserted. (R. 391-393, 413.) In January 2009, he denied any chest pain or shortness of breath upon his return home. (R. 391.)

Claimant returned for a follow up visit on April 7, 2009 shortly after he underwent another treadmill stress test. (R. 325, 387.) The overall quality of the study was good. (R. 326.) Claimant walked for almost twelve minutes without significant chest discomfort or leg pain. (*Id.*) Dr. Ghani again recommended that Claimant modify his lifestyle and stop smoking. (R. 388.) At an office visit on October 5, 2009, Dr. Ghani noted Claimant was fairly asymptomatic. (R. 385.)

On March 1, 2010, Claimant visited Dr. Ghani and complained of a sharp pressure-like sensation in his chest. (R. 383.) Dr. Ghani recommended an exercise stress echocardiography for risk stratification. (*Id.*) Claimant returned to South Suburban on March 24, 2010 for the stress test. (R. 324.) Dr. Ghani assessed the results and found Claimant had good functional capacity. (*Id.*) There was no significant evidence of exercise induced myocardial ischemia. (*Id.*)

Claimant continued to complain of increased chest pains. (R. 381.) On October 13, 2010, a chest radiograph indicated no abnormalities. (R. 346, 420.) Shortly thereafter, Claimant underwent a cardiac catheterization. (R. 417.) The procedure

revealed Claimant had patent stents and moderate nonobstructive disease of the left anterior descending artery and left circumflex artery with normal left ventricular systolic function. (R. 379.) Dr. Ghani recommended Claimant maximize medical therapy with aggressive lifestyle modification and, again, recommended he stop smoking. (*Id.*) Once discharged, Claimant denied any further episodes of chest pains or shortness of breath. (*Id.*) He was able to perform exertional day-to-day activities without any difficulty. (*Id.*)

At a follow up visit on February 3, 2011, Claimant complained of occasional chest discomfort. (R. 377.) An electrocardiogram revealed no abnormalities. (*Id.*) Dr. Ghani again recommended that Claimant modify his lifestyle and stop smoking. (*Id.*)

On October 20, 2011, Claimant underwent a CT of the brain due to complaints of dizziness and headaches. (R. 514.) The exam results were unremarkable. (*Id.*)

In April 2012, Claimant went to the emergency room and complained of chest pain. (R. 520.) A review of his systems was negative except for chest pain. (*Id.*) Claimant did not stay overnight at the hospital. (R. 519.) Dr. Ghani examined Claimant and noted that Claimant's electrocardiogram was normal. (R. 520-23.) One week later, a stress test showed normal functional capacity and no evidence of myocardial arrhythmias. (R. 517.)

At a follow up visit on August 9, 2012, Claimant complained of intermittent lightheadedness. (R. 538.) Dr. Ghani found the intermittent lightheadedness to be secondary to Claimant's postural hypotension. (*Id.*) Claimant was advised to discontinue Amlodipine and increase Ranexa. (*Id.*) Dr. Ghani also discussed at length with Claimant that he quit smoking. (*Id.*)

## 2. University of Chicago Physician Group

In 2005, Claimant injured his left heel at work and underwent surgery at South Suburban and Northwestern hospitals. (R. 486.) In May 2008, Claimant injured his left shoulder when he accidentally fell off a ladder. (R. 288.) An x-ray revealed a fracture just below the left shoulder. (R. 288, 400.) At that time, Dr. Birnie concluded that Claimant was to undergo non-operative treatment; he was given a sling and prescribed Vicodin. (R. 289.)

During a June 2008 follow up appointment, Claimant reported less pain. (R. 287.) New x-rays were taken and revealed the fracture remained minimally displaced. (*Id.*) Claimant was advised to continue using the sling and begin making gradual movements. (*Id.*)

On July 1, 2008, Claimant reported back to Dr. Birnie's office without a sling. (R. 285.) He complained it was difficult for him to move his shoulder. (*Id.*) During the visit, new x-rays showed the fracture remained more or less the same. (*Id.*) Claimant was advised to wear his sling for two weeks and perform pendulum exercises. (*Id.*)

Two weeks later, Claimant injured his left shoulder in the same location. (R. 283.) Dr. Birnie found no unusual swelling, deformity or bruising. (*Id.*) Claimant's overlying skin and circulation were normal. (*Id.*) Dr. Birnie reviewed new x-rays and compared them with those of the previous visit. (R. 283, 411.) He concluded there was no shift or displacement of the fracture fragments. (R. 283.) Claimant was advised to use a shoulder immobilizer. (*Id.*)

At a follow up visit on August 19, 2008, Dr. Birnie noted Claimant had increased his range of motion. (R. 282.) The x-rays revealed callus formation. (*Id.*) Claimant

was advised to use a sling and was referred to physical therapy.  (*Id.*)

### 3.    Oak Center for Sleep Disorders

In early 2009, Claimant was treated at Oak Center for Sleep Disorders.  (R. 306.)
He complained of loud snoring, apneic spells and frequent awakenings at night.  (*Id.*)
Claimant reported that he never woke up gasping for air.  (*Id.*)  Claimant also said he
has dozed off when stopped at a traffic light.  (*Id.*)  Dr. Sharma advised Claimant to give
up smoking and asked him to come back for a sleep study.  (R. 307.)

On May 27, 2009, Claimant participated in a sleep study.  (R. 309.)  Claimant
was diagnosed with moderate obstructive sleep apnea.  (R. 310.)  Dr. Sharma
recommended that Claimant sleep on his side.  (*Id.*)

On August 11, 2009, Claimant underwent a titration polysomnography.  (R. 311.)
The recordings revealed that with a CPAP, Claimant's oxygen saturation improved to
ninety-seven percent and his apnea-hypopnea index was reduced to zero.  (R. 311.)
Claimant was provided a CPAP for home use.  (R. 312.)

Claimant followed up in the CPAP clinic on September 3, 2009, complaining that
he had been unable to tolerate his mask and was sleeping poorly.  (R. 314.)  Dr.
Sharma increased Claimant's CPAP settings.  (*Id.*)  Claimant also complained of
frequent upper left chest pains.  (*Id.*)  Claimant did not experience any associated
sweating, palpitations, or loss of consciousness.  (*Id.*)  Dr. Sharma examined Claimant
and found he had bicipital tendonitis so he injected him locally with Lioderm and 80 mg
Depo-Medrol.  (*Id.*)  Dr. Sharma, again, advised Claimant to stop smoking.  (*Id.*)

Three years later, on November 2, 2012, Claimant followed up in the CPAP
clinic.  (R. 555.)  He said he felt "sad and grumpy," lacked energy, and had the tendency

to fall asleep at dinner.  (*Id.*)  He further complained he felt dizzy about two to three times a week and has had an extensive workup.  (*Id.*)  Claimant had not changed his mask and other necessary gear since his last visit.  (*Id.*)  Dr. Sharma recommended that Claimant's CPAP gear be replaced and he participate in a re-titration study.  (*Id.*)

### 4.    Tinley Primary Care LTD

Claimant testified that he "normally" visited Dr. Malm, a primary care physician. (R. 54-55, 545-50.)  He further explained that he had "seen [Dr. Malm] twice [and] was trying other doctors, [but] went back to Dr. Malm right before [his] heart problem."  (R. 55.)

Dr. Malm recorded progress notes of Claimant on the following dates: September 5, 2007; August 31, 2007; November 26, 2007; November 30, 2012; and December 12, 2012.  (R. 545-47.)  However, Dr. Malm's progress notes are for the most part illegible. (*Id.*)

In September of 2007, Claimant visited Dr. Malm and underwent a fecal occult blood test, which came back negative.  (R. 547-48.)  He also underwent a series of lab tests such as a comprehensive metabolic blood test, lipid panel test, and a urinalysis test.  (R. 549-50.)

### C.    Agency Consultants

### 1.    Internal Medicine Consultative Exam

On March 25, 2011, Dr. M.S. Patil, performed an Internal Medicine Consultative Examination of Claimant.  (R. 485-88.)  Claimant complained of heart problems.  (R. 485.)  He stated that he experienced chest pains whether he was physically active or was simply sitting down.  (*Id.*)  Claimant described the chest pains as a quick, sharp and

nonradiating pain.  (*Id.*)  When he relaxed, the chest pains subsided within five minutes.  (*Id.*)  Nitroglycerin provided him relief from the chest pains within four to five minutes.  (*Id.*)  Claimant further explained his history of sleep apnea and injury to his left shoulder.  (R. 485-86.)  Claimant also complained of continued mild to moderate pain of the left ankle and foot with prolonged standing or walking.  (R. 486.)  He took Advil as needed.  (*Id.*)

Upon examination, Dr. Patil noted Claimant's chest, heart and lungs were normal.  (R. 487.)  There were no deformities in the spine.  (*Id.*)  Claimant had a full range of motion of all joints, except for his left foot.  (*Id.*)  Claimant found it difficult to walk on his heel and toes of the left foot.  (*Id.*)  Claimant's mental status exam was normal.  (*Id.*)  A subsequent x-ray of the ankle revealed a slight foreshortening of the calcaneus and the appearance of a healed fracture.  (R. 488.)  There was no evidence of recent fracture or dislocation and the ankle mortise was intact.  (*Id.*)  Dr. Patil assessed a history of heart problems, sleep apnea, and left ankle and left shoulder injuries.  (*Id.*)

### 2. Bruce Protocol Treadmill Test

Claimant underwent a Bruce protocol treadmill test on June 29, 2011.  (R. 497-98.)  The test was stopped after six minutes due to fatigue and leg pain.  (R. 498.)  No evidence of cardiac ischemia was identified at the limited level of exertion that was achieved.  (*Id.*)

### 3. Psychiatric Evaluation

On April 23, 2011, Dr. Piyush Buch performed a consultative mental status evaluation of Claimant.  (R. 492-93.)  Claimant complained of having a bad heart,

fatigue and a shattered foot.  (R. 492.)  Claimant said he did not feel depressed.  (*Id.*)

Claimant's mental status examination was within normal limits.  (R. 493.)  Claimant

related well and behaved appropriately.  (*Id.*)  Dr. Buch found that Claimant's attention

and concentration were good and his memory was average.  (*Id.*)  He noted Claimant

has average intelligence and a good fund of general knowledge.  (*Id.*)  Dr. Buch further

noted Claimant has a good ability to think abstractly and has good social judgment.

(*Id.*)  Claimant was not withdrawn and was able to understand, remember, and carry out

instructions.  (*Id.*)  According to Dr. Buch, there was no evidence that suggested any

psychiatric disorder.  (R. 493.)

### 4.     Psychiatric Review Technique

On May 3, 2011, Dr. Tyrone Hollerauer, Psy.D., a state consultant, completed a

Psychiatric Review Technique form.  (R. 76.)  Dr. Holleraurer noted that Claimant has

not been treated for any mental condition.  (*Id.*)  The record showed Claimant with fully

intact memory.  (R. 76-77.)  Dr. Hollerauer concluded that the Claimant has no

medically determinable mental impairments.  (R. 76.)

On October 19, 2011, Terry Travis, M.D., affirmed Dr. Hollerauer's previous

Psychiatric Review determination of Claimant.  (R. 86.)

### 5.     Residual Functional Capacity & Vocational Factors Assessment

On July 19, 2011, Dr. Young Ja-Kim completed a Physical Residual Functional

Capacity ("RFC") Assessment of Claimant.  (R. 77-80.)  He opined Claimant could

occasionally lift 20 pounds, frequently lift 10 pounds, and could stand/walk for six hours

each in an eight-hour day, with unlimited pushing and/or pulling.  (R. 77.)  Dr. Kim

explained that he based his conclusions on the current exam that showed Claimant with

clear lung sounds, normal motor strength throughout, normal Romberg, normal unassisted gait, and normal range of motion of all extremities and spine except for the left ankle. (R. 77-78-78.) He noted the left ankle had about half the degree of range of motion as normal. (*Id.*) The x-ray revealed an intact ankle mortise, a poorly defined subtalar joint partially fused, and a slight foreshortening of the calcaneus. (*Id.*) Dr. Kim noted no postural, manipulative, or visual limitations. (R. 77-78.) Dr. Kim found some environmental limitations. (R. 78.) He opined Claimant must avoid concentrated exposure to extreme heat, fumes, odors, dusts, and gases. (*Id.*) He based these findings on Claimant's significant cardiac history and sleep apnea, and also cited the limited Bruce protocol treadmill test. (*Id.*)

On October 19, 2011, Bharati Jhaveri, M.D., affirmed Dr. Kim's previous Residual Functional Capacity Assessment determination of Claimant. (R. 86-87.)

### D. Claimant's Testimony

Claimant appeared before the ALJ on January 23, 2013 and testified as follows. (R. 39-71.) He was 56 years old, married, and lived with his wife, mother-in-law and two siblings. (R. 42.) He completed high school, but has had no other formal education. (*Id.*) Claimant has a valid driver's license and drives short distances often. (R. 43.)

In the past, Claimant has worked as a salesman. (R. 46-50.) Claimant testified that he has held six full-time jobs as: (1) a salesman for a food broker for approximately ten years, until 2001, (2) an assistant manager for a grocery store for approximately one year, until 2002, (3) an assistant manager of another grocery store for approximately three years, until 2005, (4) a salesman for lawn care for approximately one year, until 2006, (5) a salesman for janitorial supplies for approximately one year, until 2007, and

(6) a salesman for janitorial supplies at a different company for approximately one year, until 2008.  (R. 46-50.)  Claimant testified that during the above mentioned jobs he lifted between forty to fifty pounds.  (*Id.*)

Most recently, Claimant worked in the summer of 2012 putting steel siding on a factory.  (R. 44.)  Claimant testified that he got the job through a friend and that he was allowed to leave early and sit when needed.  (R. 44-45.)  Claimant further explained that the two to three week job Claimant was hired for took him ten weeks to complete because he was not physically capable of working consistent eight-hour days.  (R. 44-45.)  During those workdays, Claimant experienced foot pain that required him to sit and rest.  (*Id.*)  Claimant also stated he suffered from lightheadedness when he worked in the heat.  (R. 46.)

Claimant testified about his history of heart disease.  (R. 51-56.)  Claimant has been treated by Dr. Ghani, his cardiologist, since 2008.  (R. 54-55.)  In 2008 Claimant had two stents inserted within a year of each other.  (R. 56.)  In 2010 his artery was "opened up."  (*Id.*)  Claimant has needed to carry nitroglycerin pills at all times because of frequent chest pains, which vary between a sharp pain and a pressure-like feeling.  (*Id.*)  He is on his third bottle of nitroglycerin in two years.  (*Id.*)  Claimant was last seen by Dr. Ghani when he went to the hospital around April or May of 2013 for heartburn and chest pains.  (*Id.*)  Claimant stated he was seen in the emergency room and was not hospitalized overnight.  (R. 56.)

Claimant also experiences shortness of breath, lightheadedness and dizziness.  (R. 52.)  Dr. Ghani performed a CT of Claimant's brain, but the results were normal.  (*Id.*)  Claimant further testified of pain in his left arm.  (R. 53.)  He broke his left arm

twice and recently went to the doctor who recommended that he continue to move his arm and apply ointment.  (*Id.*)  Claimant also testified that he has experienced pain in his lower calves.  (R. 54.)  Dr. Ghani examined the circulation in Claimant's legs and the results came back normal.  (*Id.*)  Claimant stated he could only be on his feet walking for half a block before he was required to sit because of pain in his left foot.  (R. 59.)  Claimant testified that he has had problems with his left foot when lifting heavy weights of thirty to thirty-five pounds.  (R. 57.)

Claimant also testified about his sleep apnea.  (R. 54.)  Claimant has experienced extreme fatigue.  (R. 43-44.)  He has experienced such fatigue while driving long distances that have required him to pull over.  (R. 44.)  Claimant explained that he has been wearing a CPAP mask at night.  (R. 54.)  He went to the doctor at the beginning of December 2013 to have the machine reset.  (*Id.*)

Claimant explained he has been smoking since he was fifteen years old.  (R. 53.)  He was smoking three packs a day at the time of his heart attack in 2008.  (R. 52.)  He has not been successful in his attempts to quit smoking over the last ten years, but he has been trying to quit recently.  (*Id.*)

On a typical day, Claimant is usually awake by six-thirty or seven in the morning and is asleep by eight or eight-thirty at night.  (R. 64.)  He normally spends his days trying to move and drive around because sitting down triggers his fatigue.  (R. 58-60.)  He is unable to sit through an entire movie without dozing off.  (R. 64.)  He further testified that his wife is responsible for the household chores.  (*Id.*)  He is no longer able to cook, do yard work, or shovel snow alone.  (R. 60-61.)  Claimant testified that he has not been able to take any vacations, besides traveling to Florida in 2012 for his mother's

funeral.  (R. 62.)

**D.    Vocational Expert's Testimony**

Vocational Expert Julie Bose ("the VE") also testified at the January 23, 2013 hearing.  (R. 66-69.)  The VE described Claimant's past work experience as defined by the Dictionary of Occupational Titles ("DOT").  (R. 67.)  The VE classified Claimant's assistant grocery manager work as skilled and light under the DOT, but medium as performed by Claimant.  (*Id.*)  She classified his position as a sales person as semi-skilled and medium under the DOT and as performed.  (*Id.*)

Next, the ALJ asked the VE to assume the following hypothetical person: an individual of Claimant's age, education, and work experience who would be limited to perform light work except that he could occasionally balance, stoop, crouch, climb ramps and reach overhead with the left upper extremity; could not climb ladders, ropes, or scaffolds, or work on unprotected heights or dangerous machinery; must avoid exposure to extreme temperatures and irritants; and could not perform fast production pace work, but instead could only perform goal oriented work.  (R. 67-68.)  When asked if such an individual could perform Claimant's past relevant work, the VE said that he could not.  (R. 68.)

The ALJ asked the VE whether there were any transferable skills from Claimant's past work that would transfer to the above hypothetical.  (R. 68.)  The VE testified that Claimant had transferable skills in the area of persuasion from his sales positions, which would transfer to the sedentary, semi-skilled position of telemarketer.  (R. 68-69.)  She explained that there would be approximately 8,000 to 9,000 jobs in the region for the telemarketer position.  (R. 69.)

The ALJ next asked the VE to assume that the hypothetical individual, in addition to the aforementioned limitations, was limited to sedentary work. (R. 69.) The VE responded that such an individual would not be able to perform any of Claimant's past positions. (*Id.*) However, the VE testified that such an individual would be capable of performing work as a telemarketer, and there would be little to no adjustment for an individual of 55 years of age. (*Id.*)

The ALJ then asked the VE to assume that the hypothetical individual was off task twenty percent of the workday due to fatigue and dizziness. (R. 69.) The VE testified that such an individual would not be able to work. (*Id.*) The VE testified that her testimony was consistent with the DOT. (R. 69.)

## II.     LEGAL ANALYSIS

### A.     Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the ALJ's decision stand "if it

lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (quoting *Steele,* 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford,* 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that she considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985)).

### B.   Analysis Under the Social Security Act

In order to qualify for DIB, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Hatler*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the

burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, the ALJ employed the five-step analysis in reaching her decision to deny the Claimant's request for benefits. (R. 21-29.) At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date of June 1, 2008. (R. 21.) At step two, the ALJ determined that the Claimant had severe impairments stemming from coronary artery disease and angina, a 2008 myocardial infarction, stenting in April 2008 and December 2008, a left shoulder and heel fracture, sleep apnea, and postural hypotension. (R. 21-22.) At step three, the ALJ found that the Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 22-23.)

Next, the ALJ found that the Claimant has the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) except that he can only occasionally balance, stoop, crouch, climb ramps or stairs, and reach overhead with his left upper extremity; can never climb ladders, ropes or scaffolds; and must avoid unprotected heights, dangerous moving machinery, and concentrated exposure to extreme temperatures and pulmonary irritants. (R. 23-28.) Additionally, the ALJ found that the Claimant should be restricted to goal oriented work with no fast pace production requirements. (R. 23.)

Based on this RFC, the ALJ went on to conclude, at step four, that Claimant cannot perform any past relevant work. (R. 28.) However, at step five, the ALJ determined that, considering Claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the

Claimant can perform, such as a telemarketer. (*Id.*) As a result, the ALJ found that Claimant has not been under a disability from June 1, 2008 through the date of her decision.

Claimant now raises a number of issues with the ALJ's decision, arguing that: (1) the ALJ erred in her credibility determination of Claimant, which also negatively affected her RFC Assessment; (2) the ALJ erred by finding that the Claimant had acquired the skill of persuasion in his past work; and (3) the ALJ erred by finding that Claimant had the keyboard skills necessary to work as a telemarketer. We address each of these arguments in turn below.

### C. The ALJ Did Not Properly Evaluate Claimant's Subjective Symptoms.

Claimant argues that the ALJ erred in her credibility determination of Claimant, which also negatively affected her RFC Assessment. At the outset, we note that the Social Security Administration (the "Administration") has recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). In determining whether a new rule constitutes a clarification or a change, courts give "great weight" to the stated "intent and interpretation of the promulgating agency." *Id.* at 483.

Though a statement of intent is not dispositive, courts defer to an agency's expressed intent to "clarify" a regulation "unless the prior interpretation…is patently inconsistent with the later one."  *Id.*; *see also First Nat. Bank of Chi. v. Standard Bank & Trust*, 172 F.3d 472, 479 (7th Cir. 1999), *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408 (7th Cir. 1987).

Here, the Administration has in its new Social Security Ruling specified that its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules to "more closely follow [its] regulatory language regarding symptom evaluation."  SSR 16-3p, 2016 WL 1119029 at *1.  Moreover, the two Social Security Rulings are not patently inconsistent.  Indeed, a comparison of the two reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms.  *Compare* SSR 16-3p *and* SSR 96-7p.  Stated differently, "[t]he agency has had only one position, although it has expressed that position in different words." *Homemakers N. Shore*, 832 F.2d at 413.  Therefore, it is appropriate to evaluate Plaintiff's credibility argument in the context of the guidance the Administration has provided in SSR 16-3.

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 16-3p, 2016 WL 1119029 at *2.  The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *Goble v. Astrue,* 385

Fed. Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion. *Id.* In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995).

Rather, SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7. Consequently, we will only reverse the ALJ's credibility finding if it is "patently wrong." The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Here, the ALJ failed to build a logical bridge between the evidence and her subjective symptom evaluation because she did not question the Claimant about any apparent "inconsistencies" she found. The ALJ offered little more than a recitation of the medical evidence. Her analysis consisted primarily of implications that the objective medical records did not support Claimant's testimony regarding his pain and limited mobility. But, as stated above, the ALJ may not discredit the Claimant's complaints of

fatigue and limited mobility solely because they were not substantiated by objective medical evidence.

Further, the explanations the ALJ did provide for any apparent inconsistencies were flawed. First, the ALJ erroneously reasoned that falling off a ladder, mowing and removing dead branches from the lawn, and socializing with friends were activities that did "not support" Claimant's alleged limited mobility. The Seventh Circuit, however, has "cautioned against placing undue weight on a claimant's household or outdoor activities [] in assessing his ability to work full-time." *Day v. Astrue*, 334 F. App'x 1, 8 (7th Cir. 2009). The record indicates that Claimant did not perform those activities alone on a full time basis. In fact, Claimant testified that he is no longer responsible for household chores; no longer able to cook; no longer able to do the yard work and snow shoveling alone; and he visits with friends during the day to avoid fatigue.

Next, the ALJ erroneously reasoned that Claimant's alleged limited mobility was not supported by the fact that he recently worked for a summer putting up aluminum siding on a factory. Though she mentioned that his employer "accommodated him," the ALJ failed to mention that the two to three week job Claimant accepted from a friend took him ten weeks to complete because of his medical issues, and he could rarely work an eight-hour day. During those workdays, Claimant testified that he experienced foot pain that often required he sit and rest. Courts have "recognized that even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2010); *see Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003). There are crucial differences between activities of daily living and activities in a full-time job

because the Claimant has "more flexibility in scheduling the former than the latter, can get help from other persons (in this case, [Claimant's wife] and other family members), and is not held to a minimum standard, as [he] would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). For these reasons, the Claimant "should not be penalized for *trying* to work through [his] pain." *Czarnecki v. Colvin*, 595 F. App'x 635, 644 (7th Cir. 2015). At a minimum, the ALJ should have properly questioned the Claimant about his reasons for working after the alleged onset of disability. *See Henderson*, 349 F.3d at 435-36.

Furthermore, the ALJ erroneously reasoned that the Claimant's testimony of his subjective symptoms was inconsistent with his treatment history. The ALJ did not afford Claimant the opportunity to provide "good reasons" for: not being treated more for his heart problem; not being compliant in taking prescribed medications and modifying his lifestyle; not having ongoing treatment for his left shoulder and left ankle; and not returning for a follow up visit at the sleep clinic in three years. The Seventh Circuit has held that the ALJ must first consider the reasons for lack of treatment before drawing a negative inference. *Shauger*, 675 F.3d at 696; *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). There may have been reasonable explanations behind Claimant's actions, such as his inability to afford treatment, that further treatment would have been ineffective, or the treatment created intolerable side effects. *See Shauger*, 675 F.3d at 696; *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Murphy v. Colvin*, 759 F. 3d 811, 816 (7th Cir. 2014). But the ALJ failed to further investigate whether Claimant had any such explanation.

For all of these reasons, we find that remand is required because the ALJ failed to build an accurate and logical bridge from the evidence to her conclusion. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). On remand, the ALJ must first consider all the evidence in the record before making her subjective symptom evaluation. Having reached this conclusion, and with the understanding that a new RFC assessment may be required on remand, we need not comment on whether the ALJ also erred in her RFC Assessment as a result of her flawed subjective symptom evaluation.

### D. The ALJ Did Not Provide a Reasonable Explanation for the Apparent Unresolved Conflict Between the VE's Testimony and the DOT Description.

Next, Claimant argues that the ALJ erred in her determination that Claimant had acquired the transferable skill of "persuasion" in his past work as a salesperson. The ALJ relied on the VE's testimony that the Claimant had acquired the transferable skill of persuasion from his past work as a salesperson and found that he could perform the job of a telemarketer, DOT 299.357-014. That position indicates that an individual performing the job "tries to persuade customer[s] to buy" merchandise or services. According to Claimant, while the VE testified that a salesperson has the transferability of skills in the area of persuasion, the DOT description of Sales Agent, Business Services does not in fact include the skill of persuasion. Having reached the above conclusion, and with the understanding that Claimant's transferability of skills may differ on remand, we comment only briefly as to whether the ALJ erred in her transferability of skills determination.

Under SSR 00-4p, an ALJ has an "affirmative responsibility" to ask whether there is any possible conflict between the VE's testimony and the information provided in the

DOT before relying on that evidence to support a determination of nondisability. SSR 00-4p, 2000 WL 1898704 at *4; *Overman v. Astrue*, 546 F.3d 456, 462-463, (7th Cir. 2008); *see Massachi v. Astrue*, 486 F.3d 1149, 1152-53 (9th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Such an affirmative duty extends beyond asking the VE whether her testimony is consistent with the DOT, it requires that the ALJ provide "a reasonable explanation for any discrepancy." *Id.* The ALJ is only required to obtain an explanation when the conflict between the VE's testimony and the DOT is "apparent." *Terry v. Astrue,* 580 F.3d 471, 478 (7th Cir. 2009); SSR 00-4p at *1. Nonetheless, a "claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that the violation occurred." *See Prochaska*, 454 F.3d at 735 (calling language to the contrary in *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002) dicta). The burden of showing that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance" is placed on the Claimant. *Id.*

Although the ALJ argues that the Claimant waived any argument under SSR 00-4p because he did not raise it at the hearing, we find that he has not. *See Prochaska*, 454 F.3d at 735 ("[Claimant] was not required to raise this issue at the hearing, because the [SSR 00-4] places the burden of making the necessary inquiry on the ALJ.") Further, Claimant has satisfied the burden of proving that there was an apparent unresolved conflict between the VE and the DOT description. He contends that the absence of the term persuasion from the DOT description of Sales Agent, Business Services was "obvious" because one could presume the ALJ read the description in the DOT before issuing her opinion. The Seventh Circuit has previously found that if an

apparent unresolved conflict was not apparent to the ALJ at the time of the hearing it should have become apparent "at least by the time the ALJ produced [her] ruling." *Overman*, 546 F.3d at 456.  Therefore, we agree that the apparent unresolved conflict should have become apparent to the ALJ when she produced her ruling.

For these reasons, we conclude that the ALJ's reliance upon the VE's testimony without developing the record and obtaining a "reasonable explanation" for any conflict between the DOT and her testimony violated SSR 00-4p.  We remand this case so that the ALJ can assess any inconsistencies between the VE's testimony and the DOT, articulate any reasonable explanations for any such inconsistencies, and to confirm that any position is in fact consistent with Claimant's abilities and limitations.  If appropriate, the ALJ should also fully investigate whether Claimant, who lacks computer skills, could in fact perform the computer skills required in the telemarketing position.

## III.    CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: June 2, 2016**